**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

JESSICA MORGAN, on behalf of L.S., a
Minor,

    **Plaintiff,**

v.

COMMISSIONER OF SOCIAL
SECURITY,

    **Defendant.**

Case No. 3:24-CV-2292-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Jessica Morgan, on behalf of her minor son, L.S., ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. L.S. suffers from attention deficit hyperactivity disorder ("ADHD") and epilepsy, which requires him to take certain medications and creates challenges for him in school and at home. Nevertheless, because substantial evidence supports the Commissioner's decision, it is affirmed.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on behalf of L.S. on February 16, 2022, alleging disability due to his ADHD and epilepsy. She claimed that L.S. was disabled as of January 1, 2020. (R. 58). Her claim was denied on August 1, 2022. (R. 55-58). Plaintiff sought a hearing before an administrative law judge ("ALJ"), who determined that L.S. was not disabled.

(R. 21). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3).

Plaintiff now appeals the denial of DIB to this Court. She raises three issues: (1) whether substantial evidence supported the ALJ's determination that L.S. was not disabled; (2) whether the ALJ failed to fully develop the record; and (3) whether the ALJ failed to properly evaluate the medical opinions of record. (Doc. 15). The Commissioner filed a brief in opposition (Doc. 21).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* "Substantial evidence is not a high threshold, as it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir. 2022) (quotation marks omitted). Thus, an ALJ's decision should be reversed "only if it is not supported by substantial evidence or based on a legal error." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d

Page 2 of 24

893, 900 (7th Cir. 2021).

Even when the ALJ commits error, a remand is not necessary if the error is harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Where the Court "look[s] at the evidence in the record" and can "predict with great confidence" that a remand to the ALJ would generate the same result, the error is deemed harmless. *Id.*

## DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. "A child qualifies as disabled and therefore may be eligible for SSI if he has a 'medically determinable physical or mental impairment, which results in marked and severe functional limitations' and the impairment 'has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Hopgood*, 578 F.3d at 699 (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)). This analysis proceeds in three steps: First, if the child is engaged in substantial gainful activity, he is not disabled under the Social Security Act. *Id.* Second, the child will be deemed not disabled if he "does not have a severe medical impairment or combination of impairments." *Id.* If the child satisfies these two initial requirements,—*i.e.*, he is not engaged in substantial gainful activity and he suffers from a qualifying impairment or combination of impairments—the analysis proceeds to step three, which requires the child's impairments to "meet a duration requirement and . . . meet, medically equal or functionally equal, the severity of any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1." *Id.*; *see also* 20 C.F.R. § 416.924(a) (outlining mechanics of three-step disability examination).

Here, the issue is whether L.S.'s impairments "functionally equaled" the listings. This determination turns on L.S.'s ability to function in six "domains," which reflect "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). This inquiry examines the severity of the child's impairment with respect to: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." *Id.* Functional equivalence to a listing means that the child's impairment or combination of impairments results in "marked" limitations in two domains or a "severe" limitation in one domain. *Hopgood*, 578 F.3d at 699. A "marked" limitation exists when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation involves an impairment that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

The ALJ found that L.S. suffered from a marked limitation in his health and physical wellbeing. (R. 18). She found that he had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and in caring for himself. (*Id.*). She also found that L.S. had no limitation moving around and manipulating objects. (*Id.*). Plaintiff only contests the ALJ's findings with respect to her determination that L.S. had less than marked limitations in the domains of interacting and relating with others and caring for himself.

**EVIDENTIARY RECORD**

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record focuses on the points raised by Plaintiff.

## I.      Relevant Medical Records

Dr. Christopher Suhre diagnosed L.S. with ADHD on October 7, 2019. (R. 307). Teachers had noted an "elevation in inattention and hyperactivity" in L.S., and Plaintiff reported that he "gets a timeout daily in school." (R. 306). Plaintiff also told Dr. Suhre that the "teacher will have to give [L.S.] instruction multiple times" and that he often "forget[s] to complete task[s]." (*Id.*). By December 11, 2019, however, after L.S. began taking medication for his ADHD symptoms, he reported that he was "focusing well in school" although he also experienced a loss in appetite. (R. 296). On September 1, 2020, Plaintiff told Dr. Suhre that L.S.'s ADHD "medication is working good." (R. 288). Then, in March 2021, Dr. Suhre noted that L.S. was "doing well" with his ADHD medication and that he and Plaintiff had "no concerns." (R. 272).

Although Plaintiff told doctors that L.S. began experiencing seizures around 2018, (R. 41), the record suggests he did not undergo regular medical treatment for this condition until October 19, 2021, when he presented at the Washington University Sleep Medicine Clinic for "nighttime spells." (R. 395). On November 1, 2021, Plaintiff sent doctors a video showing a "nocturnal spell." (R. 413). On November 8, 2021, Dr. Jitendra Pathak ordered an electroencephalogram ("EEG") to evaluate these spells. (R. 319). The result of the EEG was "abnormal" and "consistent with benign focal epilepsy." (R. 320).

Page 5 of 24

Although the EEG revealed these abnormal findings, Dr. Pathak explained to Plaintiff that L.S.'s diagnosis of benign epilepsy had a "good prognosis." (R. 430-431). On November 23, 2021, L.S. underwent Magnetic Resonance Imaging ("MRI") of his brain to identify potential causes of his seizures. (R. 316). The reviewing physician, Dr. Brian Cusworth, concluded that the MRI permitted "[n]o findings to explain [L.S.'s] seizures." (*Id.*).

Doctors prescribed Keppra to address L.S.'s seizures. (R. 449) After one month, Plaintiff reported that L.S. had become "very, very moody." (*Id.*). By March 2022, L.S.'s moodiness had gotten "significantly worse," as he would "throw a fit over the smallest things." (R. 455). Plaintiff told doctors that although Keppra had seemingly prevented further seizures since it was prescribed, L.S.'s "mood side effects are not tolerable." (*Id.*). Throughout 2022 and into 2023, L.S.'s medical records reveal several communications between Plaintiff and his doctors in which they discuss concerns about his mood swings and how they might be triggered by Keppra. (R. 455-489).

On October 13, 2023, L.S. saw Dr. Suhre for his annual checkup (he was ten years old at the time). (R. 134-135). Dr. Suhre recorded the following impressions:

> [L.S.] reports 3 meals/day, well-balanced diet, normal portions, appropriate dairy intake, diet includes fruits, and diet includes vegetables. He reports regular dental visits and brushes teeth 2 times/day. He reports has structured bedtime routine, sleeps through the night, and no trouble getting up. He reports normal bowel movement frequency and normal consistency. He reports safe practices around pool & water, understanding of sun protection, understands insect repellant, uses helmet for biking/scootering, maintains adequate hydration, and understands conflict resolution/violence prevention. He [] denies drug use, denies alcohol use, and denies tobacco use. He reports no behavior problems, normal transition, and normal attention span. He reports socializes well with peers

and responds well to discipline (privilege restrictions). He reports gets regular exercise and no family crises stressors. (R. 134).

## II.    School Records

On February 17, 2023, Ms. Lora Wagner, L.S.'s fourth grade teacher, completed an evaluation form in connection with Plaintiff's DIB claim. (R. 217-224). Ms. Wagner noted that L.S.'s reading level was in the 53rd percentile nationally, and his math level in the 55th percentile. (R. 217).

Ms. Wagner also evaluated L.S. based on the six domains that determine functional listing equivalence. She found "no problems" in L.S.'s ability to acquire and use information and in his ability to move about and manipulate objects. (R. 218, 221). Ms. Wagner found that L.S. had problems in his ability to attend to and complete tasks, but she identified only "a slight problem" in two of thirteen functional categories: completing class/homework assignments and organizing his own things and school materials (she found no problems in the other eleven categories). (R. 219). Ms. Wagner also found that "[w]hen medicated, [L.S.] is very independent." (*Id.*). She also determined that L.S. had problems in his ability to interact and relate with others: L.S. had "obvious problems" in seeking attention appropriately and in expressing anger appropriately; he also had "slight problems" in playing cooperatively with other children and in respecting/obeying adults in authority. (R. 220). In nine other categories, however, L.S. had no problems including in making and keeping friends, taking turns in a conversation, and relating experiences and telling stories. (*Id.*). Ms. Wagner also indicated that a "plan" was in place "to help [L.S.] deal with his emotions," because he had "shut down on

multiple occasions + refused to talk to the adult in charge." (*Id.*). With respect to L.S.'s ability to care for himself, Ms. Wagner found that L.S. had obvious problems in five categories including handling frustration appropriately, and in responding to changes in mood. (R. 222). But, according to Ms. Wagner, L.S. had no problems in five other categories including taking care of personal hygiene, caring for physical needs, and using good judgment regarding personal safety and dangerous circumstances. (*Id.*). Finally, Ms. Wagner noted that with respect to L.S.'s physical conditions and wellbeing, he had a "history of seizures which occur during sleep, seizures may cause drowsiness, or absence the following day" and that his medication "causes more attention seeking behavior + more frustration." (R. 223). In addition, Ms. Wagner indicated that L.S. had 30 visits to the school nurse over the course of the ongoing school year. (*Id.*).

L.S.'s remaining school records show struggle and promise. In the first grade, L.S. went from "satisfactory" to "excellent" in math, "unsatisfactory" to "satisfactory" in english, was graded "satisfactory" consistently in science, and consistently "excellent" in art, music, and physical education. (R. 177). He also improved from "needs improvement" in the categories of "works carefully" and "works neatly" to "satisfactory" in those areas. (*Id.*). More broadly, with respect to each of the ten study habits on which L.S. was evaluated, his performance either improved or remained consistent throughout the first grade. (*Id.*).

A separate report card from Nelson Primary School shows L.S. was consistently rated "excellent" in his ability to "listen while others are speaking" and in his ability to be "considerate in speech and manners." (Doc. 193). His ability to follow directions and

his organizational skills fell off slightly over the course of the 2021 school year from "excellent" to "satisfactory." (*Id.*).

In 2022, at Woodland Intermediate School, L.S. received three term grades of "A" in math, and an A+, A-, and a B in english. (R. 191). He also received grades of "satisfactory" in all categories under evaluation, including in his ability to work well with others, class room effort, and his ability to work carefully and neatly. (*Id.*).

## III.    State Agency Examiners

In response to Plaintiff's DIB application, a State Agency Disability Determination was conducted. (R. 40-45). Dr. Jeanne Yakin reviewed medical treatment records from Dr. Suhre and noted that L.S. was "attentive" but "very active in the room." (R. 41). In a treatment note from December 11, 2019, Dr. Suhre noted that L.S. was "focusing well at school" but that his ADHD medication was causing decreased appetite. (*Id.*). In a telehealth visit on September 1, 2020, Plaintiff noted that L.S.'s "meds are working good." (*Id.*).

As to L.S.'s seizures, Dr. Yakin found that this condition began around 2018 and that they occur "randomly" but in "monthly" intervals. (*Id.*). Seizure activity includes "convulsions, eye rolling, extremity stiffness, and turning head to the side," and usually lasts between two and five minutes. (*Id.*).

Dr. Yakin also evaluated L.S.'s ADHD, epilepsy, and seizure conditions against the six domains outlined above. She found no limitations in his ability to attend to and complete tasks, interact and relate with others, move about and manipulate objects, and care for himself. (R. 42-43). She found that L.S. had less than a marked limitation in

acquiring and using information, and a marked limitation in terms of his health and physical wellbeing. (R. 42-43). Based on these findings, Dr. Yakin determined that L.S. was not disabled. (R. 44).

On March 24, 2023, the State Agency, through Dr. James Hinchen, conducted a "Recon" evaluation of L.S.'s disability and reached largely the same findings and conclusion as Dr. Yakin. (R. 48-53).

## IV.    Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing before the ALJ on November 16, 2023. (R. 27). Counsel informed the ALJ at the beginning of the hearing that "[t]he record is complete" and that there was no "additional" documentary evidence outstanding. (R. 30). On the merits, counsel explained that L.S. should be deemed marked in the domains of health and wellbeing, caring for himself, and attending to and completing tasks. (R. 30-31).

Plaintiff was the only witness to testify at the hearing. She stated that L.S. has a two-year-old brother and an eight-year-old sister. He and his sister "always fight" and bicker "like husband and wife." (R. 31-32). L.S., a fifth grader at the time, was only 42 inches tall, weighed 40 pounds, and routinely got bullied in school for his height. (R. 34). Plaintiff also testified that she gets approximately three calls from the school per week about L.S. and that he was put on a 504 plan to address his conditions. (R. 33). She also testified that L.S. wets the bed three to four times per week, a symptom she attributes to "triggers" in his brain that can be brought on by his seizures. (R. 36). She conceded, however, that L.S. finishes his homework "most times" and that he had not experienced

a seizure for four to six months. (R. 34-35).

Plaintiff has tried to sign L.S. up for organized activities including karate, gymnastics, and baseball. (R. 32). L.S. "never follows through" on these activities and wants to quit after Plaintiff has paid for them. (*Id.*). Karate was especially problematic for L.S. because he "didn't have the self-discipline" and only wanted to "chop a board." (*Id.*).

As to L.S.'s medications, Plaintiff testified that he takes Keppra to help with his seizures, and that he is on Focalin XR for ADHD. (R. 33). Keppra triggers noticeable mood swings in L.S., which creates "issues with both in-home and social skills." (R. 35). She described how "one minute [L.S.] will be happy, laughing, the next minute he'll be sad, crying, the next he'll be anxious, then he'll be irritable, then he'll be all angry, then he'll go back to happy." (R. 37). Plaintiff also described Focalin XR as ineffective because "we are still having issues, and it's severe" because she gets frequent calls from school about L.S.'s behavior and because L.S. gets into fights and gets bullied. (*Id.*). She further explained that even with L.S.'s ADHD medication, "he is a rock," and he either "jump[s] off the wall" or "isn't awake."

## DECISION OF THE ALJ

In reaching her decision, the ALJ considered the entire record.

At step one, the ALJ determined that L.S. was not engaged in substantial gainful activity. (R. 16). At step two, the ALJ determined that L.S. suffered from two severe impairments in the form of ADHD and epilepsy. (*Id.*). She also determined that L.S. suffered from *non-severe* impairments of asthma and gastroesophageal reflux disease. (*Id.*). Thus, having determined that L.S. satisfied steps one and two, the ALJ moved on to

Page 11 of 24

consider step three.

At step three, the ALJ first examined whether L.S. had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (*Id.*). She determined that L.S.'s epilepsy and resulting seizures did not meet this standard because his "seizures occur less frequently than once a month when treated with prescribed medication." (R. 17). She also considered whether L.S.'s ADHD symptoms could satisfy this disjunctive element of step three. (*Id.*). But here too, the ALJ determined that L.S. did not suffer an impairment that met or medically equaled a listing based on his "generally average to above average academic performance, the lack of significant disciplinary history involving problems interacting with others, the lack of significant allegations regarding concentration issues, and the lack of significant evidence that the claimant struggles to adapt or manage himself in a way that significantly interferes with his functional abilities." (*Id.*). Accordingly, the ALJ determined that L.S. did not satisfy step three by meeting or medically equaling a listing. (*Id.*).

With these findings, the ALJ proceeded to consider whether L.S. suffered an impairment or a combination of impairments that functionally equaled a listing. She conducted a holistic assessment of the record, which included "objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and

in all settings (*i.e.*, at home, at school, and in the community)." (R. 18). After completing her review and consideration of Plaintiff's testimony, the ALJ arrived at the following subsidiary conclusions with respect to each functional domain:

➢ less than a marked limitation in acquiring and using information;

➢ less than a marked limitation in attending and completing tasks;

➢ less than a marked limitation in interacting and relating with others;

➢ no limitation in moving about and manipulating objects;

➢ less than a marked limitation in the ability to care for himself; and

➢ a marked limitation in health and physical well-being.

(*Id.*) (underlined in original). The ALJ credited Plaintiff's testimony that L.S. "struggles academically and behaviorally at school and that his difficulty with social interaction may be aggravated by his medication." (R. 19). She also appeared to credit Plaintiff's description of L.S.'s symptoms that included seizures and frequent bedwetting. (*Id.*). But the ALJ found that "the allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). Thus, she proceeded to explain each domain-based subsidiary conclusion.

  **Health and physical wellbeing.** The ALJ found that L.S. had a marked limitation in this domain. (*Id.*). This finding was based on L.S.'s benign focal epilepsy, which resulted in periodic seizures when L.S. was asleep. (*Id.*). The ALJ also found L.S.'s "delayed development" in terms of his body weight—which placed him in the bottom 10% for his age group—to suggest significant limitations in this domain. (*Id.*).

**Acquiring and using information.** Here, the ALJ found that L.S. had a less than a marked limitation. (*Id.*). She determined that L.S. "generally performs well in school." (*Id.*). She based this conclusion on L.S.'s "satisfactory" and "excellent" marks in all areas of assessment during the 2019-2020 school year, his "near mastery" of writing, and his proficiency in math. (*Id.*). She also cited Ms. Wagner's report as evidence that L.S. "ha[d] no problems in the area of acquiring and using information." (*Id.*).

**Attending to/completing tasks.** The ALJ found that L.S. had less than a marked limitation in this domain. Here too, she cited Ms. Wagner's observation that L.S. had "'mostly no problems in completing tasks' except for completing and returning makeup work following absences from school." (*Id.*) (quoting Wagner Report). The ALJ recognized L.S.'s ADHD diagnosis but observed that his function had improved since his initial diagnosis in 2019: "the claimant has since been noted by teachers and his parents as doing well with ADHD medication." (R. 20).

**Interacting/relating with others.** The ALJ determined that L.S. had less than a marked limitation in this domain. Here, she noted some conflicting evidence. She found that although Ms. Wagner determined that L.S. had "mostly no problems" interacting with others, he had "obvious problems" in seeking attention properly. (*Id.*). She also noted that after L.S. began taking Keppra to manage his seizures, he became increasingly moody and was prone to "exaggerated emotional reactions." (*Id.*). The ALJ also appeared skeptical of Plaintiff's testimony concerning L.S.'s inability to get along with his fellow students. On this point, she noted the lack of evidence corroborating this claim. (*Id.*). And more broadly, the ALJ determined that "[t]he record does not contain additional

significant evidence that the claimant experiences problematic interactions with teachers or fellow students." (*Id.*).

**Caring for himself.** The ALJ found L.S. to have less than a marked limitation in this domain. Although he had occasional trouble staying on his seizure medication, the ALJ found that "the record does not contain significant evidence of failures to attend basic personal needs such as personal hygiene." (*Id.*). She also found that although L.S. "has been assessed by teachers as having difficulty controlling his emotions and caring for himself emotionally, . . . the record does not contain significant allegations that would rise to the level of a marked limitation in this area." (*Id.*).

**Moving about/manipulating objects.** The ALJ found no limitations in this domain because the record revealed no indication that L.S. had difficulty ambulating or manipulating objects. (*Id.*).

The ALJ also reviewed the findings of the State Agency Disability Determination and found them to be "partially persuasive." (*Id.*). She agreed with the findings of Dr. Yakin and Dr. Hinchen on the domains of acquiring/using information (less than marked) and health/physical wellbeing (marked). (R. 20-21). But the ALJ *disagreed* with the conclusion by Dr. Yakin and Dr. Hinchen that L.S. had no limitations in the domains of attending/completing tasks, interacting/relating with others, and caring for himself. (R. 21). On these points, the ALJ emphasized L.S.'s emotional struggles, his difficulty interacting with figures of authority, and his struggles expressing anger and seeking attention. (*Id.*). Thus, the ALJ found that L.S. "experiences limitations, albeit less than marked limitations, in these areas." (*Id.*).

The ALJ found Ms. Wagner's assessment of L.S. "persuasive." (*Id.*). She explained that Ms. Wagner provided detailed assessments of L.S.'s functional and emotional capacity and offered additional "notes" about his emotional state and the challenges he faces. (*Id.*). The ALJ specifically highlighted Ms. Wagner's assessment that L.S. had "no problems in the majority of activities related to interacting and relating with others." (*Id.*).

Thus, having found that L.S. only suffered a marked limitation in one of the six functional domains, the ALJ determined that he was not disabled within the meaning of the Social Security Act. (*Id.*). Plaintiff, as noted, contests the ALJ's decision only with respect to her findings that L.S. had less than marked limitations in the domains of interacting and relating with others and in caring for himself.

**DISCUSSION**

**I.    Whether the ALJ erred in finding that L.S. had less than marked limitations in Interacting and Relating with others and in Caring for Himself.**

The crux of Plaintiff's criticism of the ALJ's decision focuses on the lack of weight she assigned to her testimony about L.S.'s struggles. She also accuses the ALJ of overemphasizing Ms. Wagner's report as evidence of less than marked limitations in the two domains she contests. The Court will examine the record with respect to L.S.'s limitations in these domains to determine if the ALJ's decision is supported by substantial evidence. But in doing so, the Court's role is limited as it may not "reweigh the evidence, resolve debatable evidentiary conflicts, [and] determine credibility," *Gedatus*, 994 F.3d at 900.

**Interacting/relating with others.** This domain considers how well L.S. can

"initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). Plaintiff disputes the ALJ's determination of a less than marked limitation in this domain. She cites Ms. Wagner's assessment that L.S. had "obvious problems" seeking attention properly and expressing anger appropriately.

Plaintiff also cites her own testimony to emphasize L.S.'s struggles. She testified that L.S. and his sister bicker like husband and wife and that he never follows through on organized activities including gymnastics, baseball, and karate. She attributes L.S.'s struggles in karate specifically to his lack of self-discipline. Plaintiff also emphasized L.S.'s mood swings, his behavioral problems in school, and the fact that she routinely gets three calls per week from teachers because L.S. refuses to engage with people in authority. She also explained how "one minute [L.S.] will be happy, laughing, the next minute he'll be sad, crying, the next he'll be anxious, then he'll be irritable, then he'll be all angry, then he'll go back to happy."

The ALJ was not bound to credit Plaintiff's testimony word for word. *Prill*, 23 F.4th at 748. Although Plaintiff testified that she received frequent calls from school about L.S.'s behavior, and that L.S. was bullied by his fellow students, the ALJ was entitled to credit Ms. Wagner's account that "[w]hen medicated, [L.S.] is very independent" and that he at most had "slight problems" playing cooperatively with other children and in respecting/obeying adults in authority. In nine other relevant categories, moreover, Ms. Wagner concluded that L.S. had *no problems* including in making and keeping friends,

taking turns in a conversation, and relating experiences and telling stories. And while the ALJ did not specifically mention Dr. Suhre's treatment notes from October 13, 2023, his observation that L.S. "socializes well with peers and responds well to discipline (privilege restrictions)" bolsters her decision to weigh Ms. Wagner's report more heavily than Plaintiff's own testimony. *See Butler*, 4 F.4th at 501 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Gedatus*, 994 F.3d at 903 ("An ALJ need not rehash every detail each time he states conclusions on various subjects."). Accordingly, the record does not demonstrate that the ALJ's decision was "patently wrong" on this point. *Prill*, 23 F.4th at 748.

The Court does not question the seriousness of L.S.'s behavioral struggles or the treatment he occasionally receives from fellow students about his size. But the Court is prohibited from re-examining the ALJ's credibility determinations. At best, Plaintiff's testimony reveals an evidentiary conflict, which is not enough to warrant an order of remand. *See Gedatus*, 994 F.3d at 903 ("[T]he presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence.").

For these reasons, the Court finds that the ALJ's decision that L.S. suffered only a less than marked limitation in his ability to interact and relate with others was based on substantial evidence.

**Caring for himself.** This domain considers L.S.'s ability to "maintain a healthy emotional and physical state, including how well you get your physical and emotional

wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k). The ALJ determined that L.S. had a less than marked limitation in this domain. She acknowledged that L.S. "has been assessed by teachers as having difficulty controlling his emotions and caring for himself emotionally." But this finding did not outweigh the record evidence as a whole, which, in her view, "does not contain significant allegations that would rise to the level of a marked limitation in this area."

Here too, Plaintiff relies heavily on favorable notes in Ms. Wagner's assessment of L.S. and her own testimony to make what effectively amounts to a weight of the evidence argument. She cites Ms. Wagner's finding that L.S. had "shut down on multiple occasions + refused to talk to the adult in charge." She notes L.S.'s frequent bedwetting, his repeated absences from school, his 30 visits to the school nurse, and his problems sleeping. She also cites her testimony where she described L.S. acting like a "rock" when he is on his ADHD medication, and that he either "jump[s] off the wall" or "isn't awake." And she points to L.S. being the victim of bullying by other students, the school's challenges in handling his behavioral outbursts, and his disruptive behavior during class as further evidence of his inability to properly care for himself.

Here, the Court acknowledges that the ALJ's reasoning is somewhat tenebrous. But that does not mean it was not based on substantial evidence. Again, "[a]n ALJ need not rehash every detail each time he states conclusions on various subjects." *Gedatus*, 994 F.3d at 903. Many of Plaintiff's arguments criticizing the ALJ's decision in this domain

rest on the same testimony she highlighted on the issue of L.S.'s ability to interact and relate with others. And the Court has already explained why this testimony cannot carry the day when viewed in the context of other record evidence that refutes the seriousness or intensity of the challenges Plaintiff described.

Moreover, on the issue of L.S.'s ability to care for himself, the record offers additional indications supporting the ALJ's decision. As noted above, Dr. Suhre recorded the following observations in October 2023, three months before the ALJ issued her decision:

> [L.S. consumes a] well-balanced diet, normal portions, appropriate dairy intake, diet includes fruits, and diet includes vegetables. He reports regular dental visits and brushes teeth 2 times/day. He reports has structured bedtime routine, sleeps through the night, and no trouble getting up. He reports normal bowel movement frequency and normal consistency. He reports safe practices around pool & water, understanding of sun protection, understands insect repellant, uses helmet for biking/scootering, maintains adequate hydration, and understands conflict resolution/violence prevention. He [] denies drug use, denies alcohol use, and denies tobacco use. He reports no behavior problems, normal transition, and normal attention span. . . . He reports gets regular exercise and no family crises stressors.

These treatment notes strongly support the ALJ's decision that L.S. did not have a marked limitation in his ability to care for himself. Nor does the recency of Dr. Suhre's notes undermine their evidentiary value because they are consistent with Ms. Wagner's observation that L.S. had no problems taking care of personal hygiene, caring for physical needs, and using good judgment regarding personal safety and dangerous circumstances.

Again, the Court is not permitted to resolve the evidentiary conflict between

Plaintiff's testimony and other record evidence that tells a different story. There is no doubt that L.S. struggles behaviorally, emotionally, and physically. But the question is not whether the record contains evidence supporting that finding—it does. The relevant question is whether substantial evidence supports the ALJ's decision that L.S.'s limitations are less than marked. And on that question, the record reveals such evidence too. Accordingly, the ALJ's determination that L.S. had less than a marked limitation in his ability to care for himself is supported by substantial evidence.

**II.      Whether the ALJ failed to fully develop the record.**

Plaintiff also faults the ALJ for denying her claim for DIB based on an incomplete record. This argument is unavailing because Plaintiff offered an affirmative representation at the hearing that "[t]he record is complete." It is well-settled that a plaintiff may not wait until an appeal to raise an issue she finds meritorious; the failure to raise it before the ALJ results in waiver. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

Plaintiff's argument also relies on pure speculation as to what the purportedly missing records might say. She points to Ms. Wagner's reference to L.S.'s 504 plan and faults the ALJ for not obtaining a copy of it before rendering a decision. But Ms. Wagner's evaluation suggested that the "plan" would "help [L.S.] deal with his emotions." (R. 220). There is no indication to suggest that the plan would reveal information that would undermine the ALJ's decision and the evidence on which it rests. The same is true of Ms. Wagner's observation that L.S. visited the nurse 30 times. Neither Plaintiff's brief, nor her testimony at the hearing, offer any indication of why L.S. saw the nurse so often. And

even if Plaintiff could offer such evidence, to conclude that it would undermine the validity of the ALJ's conclusion requires speculative leaps that are not appropriate.

Accordingly, remand is not warranted based on the gaps in the record that Plaintiff only identified on appeal.

**III.      Whether the ALJ failed to properly evaluate the medical opinions of record.**

Plaintiff's final argument targets the ALJ's evaluation of certain medical opinions in the record. As the Court understands her argument, she criticizes the ALJ for not sufficiently explaining her determination that the reports of Dr. Yakin and Dr. Hinchen were "partially persuasive." Drs. Yakin and Hinchen reached largely consistent conclusions with respect to L.S.'s limitations, and the ALJ agreed with their findings in the domains of acquiring/using information (less than marked) and health/physical wellbeing (marked). (R. 20-21). But the ALJ *disagreed* with the conclusions of Dr. Yakin and Dr. Hinchen that L.S. had no limitations in the domains of attending/completing tasks, interacting/relating with others, and caring for himself. On these points, the ALJ emphasized L.S.'s emotional struggles, his difficulty interacting with figures of authority, and his struggles expressing anger and seeking attention. Thus, the ALJ found that L.S. "experiences limitations, albeit less than marked limitations, in these areas."

Plaintiff faults the ALJ for not sufficiently evaluating the "supportability" of the opinions of Dr. Yakin and Dr. Hinchen. Supportability is one of the criteria that an ALJ considers in determining the weight she will assign to a medical opinion. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative

medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

But Plaintiff's argument is fundamentally perplexing because the ALJ *disagreed* with the conclusions of Dr. Yakin and Dr. Hinchen in the domains she contests. In effect, Plaintiff argues that the ALJ erred in not adequately considering the supportability of these medical opinions. But the ALJ's decision demonstrates that she gave no credence to these opinions with respect to the domains that matter here. This means that the ALJ effectively *agreed with Plaintiff* that the conclusions of Dr. Yakin and Dr. Hinchen regarding L.S.'s ability to interact and relate with others and his ability to care for himself were not sufficiently supported. Indeed, she said exactly that in her written decision. The opinions of Drs. Yakin and Hinchen, according to the ALJ, were "*inconsistent* with the record as a whole with regard to the assessments of no limitations in the areas of attending/completing tasks, interacting/relating with others, and caring for self."

Courts "will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F. 3d 702, 707 (7th Cir. 2013). Here, Plaintiff has offered at best a procedural error in the ALJ's review, without explaining how this error led to an unfavorable outcome. Considering the ALJ's *departure* from the conclusion of Dr. Yakin and Dr. Hinchen that L.S. had no limitations in his ability to interact and relate with others and in caring for himself, the ALJ's failure to examine the supportability of these opinions more fully amounts to harmless error, if it amounts to an error at all. *See Joan K. v. Saul*, No. 19-2255, 2020 WL 6930515, at *2-3 (N.D. Ill. Oct. 5, 2020) (failure to resolve conflict between medical

opinions was harmless error). And for that reason, the Court can say with great confidence that the result on remand would be the same, notwithstanding the ALJ's purported failure to strictly follow 20 C.F.R. § 404.1520c(c)(1).

CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security.

**IT IS SO ORDERED.**

**DATED: March 31, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**